May it please the Court, my name is Rachel Steinholt and I represent Mr. Goodlow. We are asking this Court to vacate the counts involving the sexual abuse and sexual contact at the campgrounds and the rock formation, as well as accounts for sexual exploitation of a minor, attempted receipt of child pornography, and witness hampering. The first issue I will address relates to the sexual abuse and sexual contact counts. Counts 1 through 10 were the hands-on offenses that were alleged to have occurred in one of three locations, Swallow Ranch, the campgrounds, and the rock formation. So the government didn't prove the campgrounds and the rock formation were located in Indian Country. Counsel, I just have a fundamental maybe confusion or misunderstanding. Is that a question of law or a question of fact for the jury? Because I'm struggling with that and I'm probably the only one here, but can you help me through that? Sure. I think we've said before that that is a question of law for the district court. What does a jury have to do with it if that's the case? Well, I think the easiest way is that there is an out regardless of who has to decide. I will answer that question, but really regardless of who has to answer that question, more fundamentally it is the government's burden to prove where this occurred. And as we stand here today, nobody can point to a map and show where these two locations are. We have cases, though, on the special maritime jurisdiction of the United States where courts will take judicial notice. And because in those contexts I think it's a question of law, Indian Country seems to be different. Why? Well, I think you're referring to the Love case where there was judicial notice taken and that was at the U.S. medical facility in Springfield, Missouri. And that is distinguishable here because that was a BOP facility. You can point to Springfield, Missouri, U.S. medical facility on a map. And that is the difference here. So are you saying there was insufficient evidence for Judge Schrier to conclude as a matter of law that these events, if they occurred, occurred on Indian Country? I think it's both. I think it's for the jury and for the judge. So to go back to your original question, whether an identified piece of land is in Indian Country, that's for the court to decide. That's a legal question. And then whether an offense actually took place and whether that offense took place on that piece of land, that's for the jury. But here we don't know where those locations are. So the judge can't decide really where, if this was in Indian Country, if we don't know on a map where this is, and either can the jury. But again, the out is that you don't need to necessarily get bogged down in that question specifically because regardless of who has to decide it, the government has to prove it. And here nobody can point to where these two locations are on the map. What does the record tell us about the decision itself? Did the judge make a decision that's in the record? And what did the judge rely on to conclude it was Indian Country? Yeah, so the judge did. There was a post-verdict motion that was made. And the judge really gleaned sort of five reasons of why the judge felt that this was in Indian Country. So two of those bases are… Well, was that her, again, back to the judge jury question? Yeah. She didn't rely on, she said there was sufficient evidence for the jury to reach that conclusion, correct?  Yep, and that was based off of five reasons. So the judge found that a reasonable jury could have found that the area immediately surrounding Swallow Ranch was on the Pine Ridge Reservation. And then also that the aerial images of Swallow Ranch show that the property was not immediately next to the jurisdictional border. But those are insufficient because really what the court is relying on there is sort of a fundamental understanding of like, as if there were clear boundaries of where and how far Swallow Ranch extended. And in the record, we don't have a clear indication of how far Swallow Ranch goes. Is Swallow Ranch on Pine Ridge? Yes. Okay, so that's within Indian Country. Correct. And is there any testimony that the campground, I guess maybe this is what you're saying, there's no testimony that the campground and thus the rock formation are on the Swallow Ranch? Correct. And so here's the testimony that we do have about Swallow Ranch. We have that the ranch sort of begins, these are direct quotes, so this is on page 48, that the ranch sort of begins, there's a couple of residences, there's a house and a few trailers. Those are up on the top of the table. And the property extends quite a bit north, which goes into more badlands type terrain. We have a second sort of discussion about Swallow Ranch, that Swallow Ranch is on the Cooney Table area of the Pine Ridge Indian Reservation. It's just east of the Buffalo Gap. What that doesn't tell us is how far. There's no clear sort of boundaries of how far that goes. It's just sort of a vague description. Would this have been a legitimate basis for a pretrial motion to dismiss based on lack of jurisdiction? The government hasn't shown that on their theory that these spots are within Indian country so that then it would be a clear question of law for the district court to make. What are the boundaries? Where are we talking about? And then the jury could find either it happened or it didn't or where it happened. Sure. Well, I think this is why this is more appropriately a jury question is these properties could well be, the campground and the rock formation could very well be in Indian country. They are, right? We're on a sufficiency of the evidence, I understand. I understand your argument that that wasn't shown, but you're not arguing here that these are demonstrably not on the Indian Reservation in some sort of error of law, right? Yeah, we are, actually. That these two locations are not? Well, it's because we don't know where these locations are.  There's insufficient evidence, but you're not suggesting half a step further maybe, and maybe it doesn't matter to you, but on the distinction between a matter of law, if Judge Schreyer had to make a legal conclusion, generally we would review that de novo. And I understand that's not where we're at here for reasons that still confuse me, but I understood it as the government just didn't show enough. This sort of vague general vicinity of the Swallow Ranch isn't good enough, right? I mean, that's the heart of your argument. Right, exactly. Yeah, and they could have. They brought in two agents to testify, Lionel Weston and Agent Beery. They were two questions short, weren't they? Yeah, I mean, where are these campgrounds? I mean, there's three maps that were entered in as exhibits. Show us where these two locations are on the map. They had two potential witnesses that could have testified to those points, and it just didn't happen. What if you were to say that it's an hour-long horseback ride from the house, the Swallow Ranch house, to the campground? Would that be safely within the map that is delineated as Indian country? No, I don't believe so. The reason is because when you look at the maps, none of them have keys on them that say any sort of distance. We don't know if the maps are to scale. There wasn't testimony to say if the maps were to scale. There wasn't testimony that it's from Swallow Ranch residents. It's just sort of from Swallow Ranch generally, which goes back to that whole point about we don't know how far Swallow Ranch extends. So when you are referencing Swallow Ranch as a relational distance point, what does that mean? Does that mean the house? Does that mean just the outer bounds of Swallow Ranch generally? Is there any part of Swallow Ranch that's not on the reservation? No. How do we know that? Because there was testimony from Agent Berry that said Swallow Ranch in and of itself is. . . The entire, but we don't know how big it is. Exactly. Again, the campground and the rock formation, we don't have testimony that those are part of Swallow Ranch. They are two other locations. What we have about them, here's the testimony that we do have about them because I've explained what we don't have. We don't have a spot where we can point to them on these three maps that were entered. We don't have GPS coordinates about where those two locations are. So what we have are that the campground is, quote, quite a ways back into the Badlands. It can be reached by, quote, a long walk and through horseback or side-by-side. That's what we have for the campground. What would the Badlands, like does the jury hear what the Badlands means or is that something commonly understood in that part of the state? The jury does not hear the extent of the Badlands. We know that the Badlands aren't exclusively in Pine Ridge Reservation. Are they partly in? Partly in, yes, but not exclusively. Again, that's not conclusive as to where exactly these locations are. Then we have even less information about the rock formation. All we have about the rock formation is that it was located halfway between the ranch and the campground. What's our standard of review here? Maybe it's the same or similar to the district court. I mean, the standard is pretty low, isn't it, when we're looking at sufficiency? Is it basically any evidence in the record that might support the jury's conclusion on this? Is that where we're at? Yeah, it is with any inferences drawn in favor of the verdict. But the jury's verdict and the inferences therein cannot be just based on mere suspicion or the possibility of guilt. If the government's evidence is equally strong to infer innocence as it is to infer guilt, then the verdict must not be one of not – I mean, the court has a duty then at that point to direct an acquittal. So even though it is a deferential standard of review, it is still not a give-me, if you will. I do want to move to count 13, which is the attempted receipt of child pornography of CJE count. And here the evidence was insufficient to prove that Goodloe knowingly attempted to receive child pornography. And this is because the government just did not prove that Goodloe knew CJE's age. CJE did not testify that she told Goodloe her age when they were communicating. The Snapchat records do not reveal that CJE's age was discussed when they were communicating. CJE had testified that she had only seen Goodloe once, and that was at her grandfather's funeral. And Goodloe may have known members of CJE's family, but he didn't know CJE because she did not live at the same residence as the family members that he knew. So on this record, which on her testimony was a whole eight pages of the whole trial, even when viewed in the light most favorable to the verdict, the evidence is insufficient to prove that Goodloe knowingly attempted to receive child pornography as he did not know CJE's age. I know you're in your rebuttal, but I'd like to ask you about the witness, the last count, the witness tampering count on that. Because I do have a question about the evidence that was offered to support that. What else is in the record other than Mr. Goodloe saying, I don't want to go to jail, I could lose my kids? Is there any other reference to the idea that it would be a federal proceeding? No. And importantly, as to the witness tampering count, there's a potential for two contemplated proceedings. So the criminal trial that they're in, the federal case, but then also in those exchanges, in that exhibit that has those exchanges with NS, he talks about probation. And what's important about that is that, so the jury hears that he's on probation, but they did not hear if even that probation was state, federal, or tribal even. So where we have two contemplated potential proceedings, and the jury only knows that one of the two is in fact federal, then it isn't unclear, it's insufficient, the evidence is insufficient to show which one he was attempting to influence. And what about even the trial, the federal proceedings that actually turned out to be, would he have been subject to state or tribal charges for this? If it was on the reservation, would it be tribal? Would he be subject to tribal charges? I'm hesitant to give a clear answer on that.  I don't believe so, but I'm not sure. If I may reserve the remainder of my time. Thank you. Thank you, Ms. Stienholt. Mr. Kovner? Good morning. May it please the Court. My friend and colleague, Ms. Stienholt. I'm Kevin Kovner with the U.S. Attorney's Office in South Dakota. We are here asking the Court to affirm all the convictions in this case. I want to take up the last few questions first just because they're top of mind. On the witness tampering count, to answer your question, Judge Kelly, what else is in the record that would be a federal proceeding? This defendant testified that he lived on Pine Ridge his entire life, that he was from Manderson, that he lived in this Cooney Table area. He also testified about how there was testimony about how he was concerned because he's on probation. Now, you could be on probation for a variety of things, but there's certainly a contemplation. And, of course, the jury was told about the Major Crimes Act jurisdiction here as part of the elements. Could he be liable for a state charge? Not here because it occurred entirely within Indian country. And there also is sort of an overlay. This was very early in the process. So if I understand correctly, when he's making the statements to the text messages, to the girls, they're an investigation that not even started yet, had it? It had just gone to the grandmother? Yeah, Grandma had been told about it. Calls were being made. It is a little factually different than the cases that at least sort of other people involved in this similar alleged criminal activity have been investigated and maybe have been called in to the grand jury, things like that, that there's some sort of rumblings about something going on. And here, boy, it couldn't have come earlier, really, in some ways. Well, and it kind of goes to the scenario in Richardson, that recent case where there, again, there was no proceeding going on at the time. But he was facing the state. So there was criminal proceedings against that person. And it was like, oh, and the feds could pick this up. So there's already a criminal proceeding in process or sort of the eminence of one. And here I'm just puzzled about how that plays in here because it's just, well, sure, we all know that eventually this man got charged. But I just wonder how that plays into the sufficiency here when it's like no hint of any kind of criminal investigation or snooping around.  Well, I mean, this court has said that it goes to this wrongful consciousness of wrongdoing. That's from the Little Bird case and also talked about in Richardson. Clearly, if you have to know that there's a proceeding taking place, you shouldn't have carte blanche to be able to go out and, you know, tell witnesses not to talk. He did talk about, I don't want to go to jail, right? So he's thinking about criminal consequences. So I think that's the evidence. So I guess your answer is it doesn't matter how early it starts. It's just whenever it starts and shows that there's some contemplation. And I understand that.  And that's kind of the way the law has to be. Otherwise, you could go out and round up your, you know, your obstruction before the sheriff arrives, right? I want to talk about the attempted receipt. I do want to save a lot of time for the jurisdiction questions because I know that's big, but I'm just kind of going in order. On the attempted receipt, re-CJA and the knowledge of age, in his own testimony, he talked about how he was very knowledgeable of CJA's family. He'd spent time on their ranch between, I think, Manderson and Wounded Knee. He talked about he'd spent time with the brothers. She talked about how she had met him one time at a grandfather's funeral. He offered up that she didn't live there at the ranch. She lived with a mother or grandmother somewhere away from the ranch. So, he had knowledge of this child and intricate knowledge of her family and how she fit in with that family. Apparently, he knew the older sister quite well and even asked questions about that in the text exchanges. I'll point out that was not information discussed in those text exchanges. So, this is things that he admitted in his own testimony he knew about this child beforehand. So, I think that's the evidence there with the knowledge. Now, let's talk about the jurisdictional questions. I think there's a conflation here of some terms. When the agent is talking about the Swallow Ranch, the agent is talking about, he says, the ranch begins, there's a couple residences, house, trailers, property, and the property extends quite a bit north into the Badlands. So, when the witnesses are talking about the Swallow Ranch, they're talking about the entirety of the ranch, not just the housing area where the residences are at. And I think there's been a conflation here in the briefing that the ranch seems to be now only referring to the housing area, but that's not what the witnesses were talking about. They were talking about this entire larger area. But nobody said how big it was. Well, there is some evidence here. One thing I'd point out is, again, in the defendant's own testimony, he's talking about what was he doing that day he was confronted. He was out working on the northern fence line. Where was that? He said, well, it's about 20 minutes by car. So, that's where the cattle are, is what I think he testifies about. There's the, Judge Kelly, you mentioned about the horse ride. One of the child witnesses talked about it being about a half-hour horse ride to where this campground area of the ranch is. How far can you get on a horse in the Badlands in a half-hour? That's something that reasonable inferences could be made. It's a matter of a couple miles within this larger area. Was there any evidence put in to what distance that could include? No evidence with respect to how fast a horse could travel in things that specific, Your Honor. And you said the campground on the ranch. Is that in the record that the campground is on the ranch? Or is that an inference that you were asking the jury to make? Well, so the ranch is talked, the camp is talked about as being out in this area referred to as the Badlands. The agent talks about the ranch extending quite a bit into Badlands area. So, you know, do we have surveyors out there talking about exactly where these spots are? No, but we have these terms that are being used, and I think now are kind of being conflated. But in context, it appears that the witnesses, when they were using these terms, they were talking about these terms as within areas within the ranch, the larger area. Was there anything posed to the jury with respect to the location of? No. Was there anything? No. This jurisdictional question simply did not arise. And, in fact, it was this blanket sufficiency challenge at the end that didn't even mention this, and it only comes up on this post-conviction briefing, this question. So we have cases that say whether or not a specific piece of land is Indian country or not is a question of law for the district court judge. We have cases on appeal where the jury was instructed to make that finding, and we affirm, even though we note there may have been error. Right. Was it error to submit this to the jury? Well, we do that all the time. Now, that's not an answer. Is that the way this is done? Because we have cases saying, don't do it, but we always approve it when it happens. Always. I mean, we approve it when it happens. And it doesn't seem to be a matter that's contested in the district courts on jury instructions or things like that. Like, judge, you need to make a preliminary finding. You need to make a post-evidence finding. Yeah. And I think it's perhaps because, Your Honor, your confusion is maybe well-grounded, and the fact that there is some confusion in the Law of the Love case that's been mentioned, I think, doesn't clarify with a lot of precision about whether it's a legal question or a factual question. Do you think the district court could have judicially noticed the locations here? I think so. And that's under Love? And I think that's under Love, and that's under the general notion that questions of jurisdiction. But we also say it's an element of the offense, right, which is submitted regularly to the jury. I can't make heads or tails of it. Yeah. If you can in a short time, but it seems to me there's ambiguity. I think there is some ambiguity, and I think that's why we tend to submit it as a factual question. I want to say on the factual piece of it in terms of, you know, what is on this Exhibit 64, I heard tell that there's no real scale on that. Well, there's town names on that map. And the version that's in the briefing, reproduced in the briefing, isn't all that clear, but the actual exhibit itself is very clear. It's a map of Oglala-Lakota County. The entirety, there's not a square inch of that county that isn't in the Pine Ridge Reservation. Redshirt Table at the top, anyone who knows that county knows that's roughly 50, 55 miles from Pine Ridge Village. Anyone who knows that county knows that Pine Ridge is roughly, you know, 25 miles by car to Manderson, etc. So there's, I think it's just not true to say that a person can't look at that map and reasonably infer a scale from that map. There is sort of a concern that if it's truly, if you send that part of it to the jury, that one jury is going to say, in this case, the campgrounds in Indian Country, and then the next jury is going to say it's not. And it seems like it's either is or it isn't, and then the jury decides, well, did it actually happen there or did it not? But, of course, we're in the realm of, if it's a factual question, the realm of reasonable inferences. And so we do have a point on that map where we've, you know, the address of those residents that's been talked about. Exhibit 64 was before the jury. Yes. And that was testified to by the BIA witness and also, I think, the FBI case agent. And, by the way, the FBI case agent made a number of additional statements referring to, you know, going down to investigate this on Pine Ridge, referring to this entire area as being reservation territory. The court has asked in various ways whether there's any, you know, real-world question as to whether this was on the Pine Ridge reservation. Absolutely, there's no real-world question about it. There's just simply, I mean, everyone knows here that this was on the reservation, but, of course, that's where we're at, what's been put in the evidence here. And so, you know, I'm looking at things like in terms of, you know, the reasonable inferences that can be drawn. We have testimony about it being a walking distance to this campground, perhaps a long walk, that the rock formation is closer than the campground to the houses, that the entire area of the ranch extends much farther north by the CUNY table area. That's all reference points that can be seen on that map. We also have, you know, I think that testimony about fixing the fence line, a 20-minute car ride away on the northern portion is important. There's no, I mean, certainly a 20-minute car ride away from that address into that area of the reservation, that direction would be clearly still within Oglala-Lakota County. Judge Kobus, you asked the question, you know, were we two questions short. Could this record have been more fulsome on this? Absolutely. And so I'm not here to say that this was buttoned up in the way that, you know, it'll be a learning experience in terms of buttoning these things up in the future. But I think on this record, it's certainly sufficient, and we have a number of things in the record to draw inferences from in order to determine that all these took place within Indian Country. I want to make one mention about the potential remedy in this case. And that's just in the case that this Court isn't going along with the government's arguments on one or more of these counts. When you look at the sentencing in this case, it's very, very clear that this was a package sentencing. This was a sentencing in which the district court talked about the, you know, horrific crimes that happened here and said at the outset, this deserves a 40-year sentence, and then allocated those sentences, the consecutive nature of some, the concurrent nature of some, to reach that 40 years. So if there are any counts here that the Court decides shouldn't be affirmed, it should go back for a full resentencing so the district court can contemplate what sentence in a package form is appropriate here. I have no other further comments unless there are further questions from the Court. Thank you. Thank you, Mr. Calder. Ms. Steinholt, your rebuttal. I'll first, I'll hit the jurisdictional, the Indian Country question. So love gives the power for the Court to take judicial notice. That's not in dispute. But again, I think the key point is here that we cannot find, as nobody sitting here today can point to where the campground or the location is on Exhibit 64, or the rock formation is on Exhibit 64, Exhibit 65, Exhibit 66. Nobody can show us where those are. Is judicial notice limited to things that are in the record, the trial record? I don't think so necessarily. But I would dispute counsel's assertion that we all agree that these locations are in the, within Indian Country. I don't, I think there's a lot of inferences that are being drawn there that wouldn't necessarily be intuitive to the jury. I do want to clarify something that he mentioned that this was exclusively discussed in the post-motion, the post-verdict motion. That's not true. This was discussed in closing arguments. That was on page 479 to 478, where defense counsel said that, you know, these locations were never placed in Indian Country. Do you have a position if we do vacate some of the convictions on resentencing or how we should proceed? We would agree that it's the sentencing package doctrine would apply and that they should all be sent back together. If the court has no further questions, then we would ask for the court to remand for resentencing. Thank you. Thank you, Ms. Stainhill. The court thanks both counsel for the arguments you've provided to the court this morning. We will continue to study the matter, render decision.